# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### DELTA DIVISION

**FRANKIE T. MARTIN**                                                                 **PLAINTIFF**

**VS.**                              **No. 2:23-cv-00052 PSH**

**MARTIN O'MALLEY,[1] Commissioner,**
    **Social Security Administration**                              **DEFENDANT**

## ORDER

Plaintiff Frankie T. Martin ("Martin") appeals the final decision of the Commissioner of the Social Security Administration (defendant "O'Malley") to deny his claim for Supplemental Security Income ("SSI").  Martin's sole claim is that the Administrative Law Judge ("ALJ") erred in determining his residual functional capacity ("RFC") by improperly considering the opinions of Drs. Mark Baltz ("Baltz") and Harry Michel ("Michel").  The parties ably summarized the medical records and the testimony given at the telephonic administrative hearing, which was conducted on June 22, 2021.  (Tr. 54-67).  The Court has carefully reviewed the

---

[1] Martin O'Malley, the newly appointed Commissioner of the Social Security Administration, should be substituted as the defendant.  Fed.R.Civ.P. 25(d).

record to determine whether there is substantial evidence to support O'Malley's decision. 42 U.S.C. § 405(g). The relevant period to be considered is from February 13, 2020, Martin's application date, through October 25, 2021, the date the ALJ issued his decision.

The claim for relief is without merit, and the decision of O'Malley is affirmed.

*The Administrative Hearing:*

Martin was 42 at the time of the hearing. Responding to questions posed by his attorney, Martin stated he resided with his mother, and had done so for the past year. Martin indicated he had never worked, and had attended school through the ninth grade, taking special education classes. He described an ability to read the newspaper but also cited problems reading, writing, adding, and subtracting. Martin estimated he would be unable to hear a grocery list and then go to the store and purchase the items.

Martin stated he had been treated for at least a year at Mid-South Health Systems ("Mid-South") and at Lee County Cooperative. The Mid-South providers prescribed a daily injection for Martin, who indicated he was compliant in taking the injection. The injection is to address hallucinations, which Martin stated interfere with his ability to focus. Although the injections "slow me down" he found he was still having problems. (Tr. 61). In addition, he said he continued to have anger issues

2

and "I can't stand to be around people." (Tr. 61).

Martin indicated he could not help his mother with cooking because he "might burn the house down." (Tr. 62). His daily activity centers around his dog, which he feeds and waters. "I play with my dog most of the time." (Tr. 64). His mother sometimes reminds him on self-care items, such as a prompt to brush his teeth. Martin allowed he could focus to watch a movie from start to finish but that he would then have a headache or migraine. He estimated having 2-3 headaches a day, and receiving treatment from Michel at Lee County Cooperative for this impairment. Martin no longer is in therapy at Lee County Cooperative due to insurance issues. Martin stated he did not leave the house alone, and recounted a motor vehicle accident from a few years earlier where he got into a fight with the other driver.

When asked by the ALJ if he had been admitted as an inpatient at a psychiatric facility, Martin said this occurred "when I was younger." (Tr. 64).

Dianne Smith ("Smith"), a vocational expert, also testified. The ALJ asked Smith to assume a hypothetical worker of Martin's age and background, with no exertional or physical limitations, with the ability to perform simple, routine, and repetitive tasks, an ability to perform simple work-related decisions, with an ability to interact with supervisors, coworkers in usual work situations, and with the ability to deal with changes in a routine work setting. Given those parameters, Smith

indicated such a hypothetical worker could perform unskilled heavy level work, with an SVP rating of 1, as well SVP 1 unskilled light work.[2]  Smith was then asked to assume a worker with chronic headaches and medication effects which resulted in an inability to maintain attention or meet normal attendance, punctuality and production requirements.  In addition, the hypothetical worker would be prone to poor anger management and impulse control and frequent bouts of hallucinations.  Such a worker, according to Smith, would be precluded from all work.   (Tr. 65-66).

  *The ALJ's Decision:*

    In his October 25, 2021 decision, the ALJ found Martin had the following severe impairments: personality disorder, mood disorder with anxiety, and borderline intellectual functioning.  The ALJ considered the impairments of migraine headaches, right elbow pain, suspected exposure to someone with COVID, neck and bilateral leg pain after a motor vehicle accident in April 2019, and alcohol abuse in reported remission, finding these alleged impairments were non severe.  Specifically, the ALJ found these impairments would have such a minimal effect on Martin that they would not be expected to interfere with his ability to work.

---

[2] SVP is the Specific Vocational Preparation required for jobs.  SVP 1 is for unskilled work, and the amount of training required to learn such a job is a short demonstration.  The higher the SVP rating the longer the amount of time to learn the job.  E.g., an SVP 9 job is skilled work which would require ten years of training to learn the job.

The ALJ concluded that Martin's impairments did not meet a listed impairment, explicitly noting he considered Listings 12.04, 12.08, and 12.11.  In reaching this conclusion regarding Martin's mental impairments, the ALJ considered the four broad areas of functioning found in 20 C.F.R., Part 404, Subpart P, Appendix 1, (the "paragraph B" criteria) finding Martin had a mild limitation in two of the four functional areas: (1) understanding, remembering or applying information; and (2) adapting or managing oneself.  The ALJ determined Martin had a moderate limitation in the remaining two functional areas: (1) concentrating, persisting, or maintaining pace; and (2) in interacting with others.

The ALJ also determined the "paragraph C" criteria were not satisfied because the record did not show Martin to have a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.

The ALJ determined Martin had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: could perform simple, routine, and repetitive tasks that involve one or two steps; could perform simple, work-related decisions; could interact with supervisors, co-workers, and usual work situations, and deal with changes in a routine work setting; and could not deal with the general public.  In reaching his RFC conclusion, the ALJ considered Martin's subjective statements, finding they were "not entirely consistent with the medical

evidence and other evidence of record" and his symptoms not "as limiting as he alleges." (Tr. 26, 27).

The ALJ addressed the medical evidence, beginning with a psychological consultative examination in January 2019 by Charles M. Spellman, Ph.D. ("Spellman"), who diagnosed Martin with bipolar disorder, antisocial personality disorder, and alcohol abuse. (Tr. 481-486). Spellman noted that Martin was receiving mental health treatment twice monthly. He also reported Martin stated he was taking four prescription drugs (but did not specify the names), had four children, helped his mother with chores other than cooking, and was released from prison in 2014. Spellman described Martin's mood as normal, affect as appropriate, and his thought processes logical, relevant, and goal-directed. Spellman found Martin's full scale IQ to be 52, but noted a lack of effort on testing. "Most of his effort was suspect and sometimes he clearly got things wrong on purpose." (Tr. 484).

In March 2020, about one month after the alleged onset date, Martin was seen at Mid-South by psychiatrist Baltz. Martin had last been seen in July 2019 when his Risperidone prescription had been increased. Baltz's plan was to resume Risperidone, and he diagnosed Martin as follows: rule out other specified bipolar and related disorder; moderate alcohol abuse; high expressed emotion level within family; other problems related to primary support group, including family circumstances;

unspecified problem related to social environment; problems related to other legal circumstances; and adult antisocial behavior.  (Tr. 640-646).

In June 2020, Martin saw Michel, his primary care physician, at the Lee County Cooperative Clinic, complaining of low back pain from heavy manual labor and migraines.  Michel assessed Martin as follows: bilateral low back pain; paranoid schizophrenia; gastroesophagel reflux disease; generalized anxiety disorder; intractable migraine without aura and status migrainosus; vitamin D deficiency; encounter for drug screening; screen for sexually transmitted disease; screen for HIV; encounter for HCV screening test for low risk patient; screening, lipid; screening prostate specific antigen; and screening for thyroid disorder.  Michel prescribed Ibuprofen for the back pain, refilled Risperdal tablets for the schizophrenia, refilled Omeprazole for the reflux disease, refilled Sertraline for the anxiety, and started vitamin D for the deficiency.  He also prescribed a Depo Medrol injection for the back pain and migraines, and counseled Martin to take medication as ordered, report side effects promptly, and return in two weeks.  (Tr. 633-639).

Martin returned to Mid-South in July 2020 and was seen by Vicky Valentine-Phillips ("Phillips"), a licensed clinical social worker, to deal with his anger issues. Two objectives were identified – one, to take all medications as prescribed and report negative symptoms within 48 hours, and two, to identify 3-5 new ways of thinking

and behaving to decrease his symptoms. (Tr. 647-651).

A telehealth session with Baltz occurred later in July 2020 where Martin described his chief complaint as his "anger problem." (Tr. 656). Baltz recorded that Martin never picked up his Risperdal prescription from his last visit, that his sleeping was okay, appetite and weight were stable, and he had no acute illnesses. Baltz rated Martin as angry and irritable, with no hallucinations, poor judgment, questionable insight, and borderline intelligence. Baltz's previous diagnoses remained, although he noted the unspecified schizophrenia was worsening and the other specified bipolar and related disorder was unstable. The plan was for Martin to take Risperdal daily and receive injections every two weeks. (Tr. 665-662).

In a telephone visit with Phillips in August 2020, Martin stated he "had not been using any coping strategies that he learned in the past" and "he is still working on obtaining disability income." (Tr. 663). A noted goal/objective was for Martin to identify 3-5 new ways of thinking and behaving to decrease his symptoms. (Tr. 663-666).

In late October 2020, Martin, complaining of "voices, and trouble sleeping," had a telehealth session with Baltz. Martin also cited continual bad headaches, for which he would be seeing Michel in the near future, and anger issues with his mother. Baltz's mental examination showed Martin was cooperative, with average eye contact,

8

clear speech, no delusions/psychotic thoughts, auditory hallucinations, intact associations, logical thought process, angry mood, incongruent affect, poor judgment and insight, normal language, borderline intelligence, selective attentive, and oriented to person, place, time, and circumstance.  In addition, Baltz found no evidence Martin was suicidal or homicidal.  Baltz noted the unspecified schizophrenia was stable, the specified bipolar and related disorder was unstable, the alcohol use disorder was moderate, and there was a chronic parent child relationship problem.  Baltz directed the treatment recommendations to continue as before, with the addition of Depakote for moods, headaches, sleep, and augmentation of antipsychotic medication. (Tr. 670-675).

In November and December of 2020, Martin failed to keep appointments to receive his injection.  (Tr. 697, 699).  Martin returned to Baltz in January 2021 with his chief complaint being "[t]he same problem . . . . . . . stressful, no income coming in."  (Tr. 704).  Martin was to continue with the treatment previously recommended, and return in three months or sooner if needed.  (Tr. 703-711).

Martin, complaining of back problems, had a telehealth appointment with Baltz in April 2021.  Baltz noted Martin was months overdue for recheck and had been noncompliant with his medication treatment.  In addition to his prior diagnoses, Baltz added Martin's noncompliance with medical treatment and regimen.  The plan was for

9

Martin to continue treatment recommendations and resume taking medications, to return in months or sooner if needed.  (Tr. 721-729).  Martin restarted his injections on April 6, 2021, and received another injection on April 26.  (Tr. 730, 752).  He failed to show for his injection on May 17.  (Tr. 751).

The ALJ next focused on Martin's daily activities, noting his ability to do manual labor and ability to help with household chores, although there was conflicting evidence on whether he actually performed those chores.

Turning to medical opinions and prior administrative medical findings, the ALJ did not give any specific evidentiary weight to those opinions or findings.  The prior administrative medical findings were both physical and psychological reports from state agency consultants.[3]  While not endorsing these reports with controlling weight, the ALJ found them persuasive.

The ALJ addressed the opinions of Baltz and Michel:

In December 2020, January 2021, and April 2021, Mark Baltz, M.D. and in April 2021,[4] Harry A. Michel, M.D., opined that the claimant had mostly marked and some extreme limitations in understanding and

---

[3]
The state agency consultants found Martin's physical impairments were not severe, and the psychological consultants found him to have limitations but nonetheless capable of performing some work with adaptations.  (Tr. 112-131, 134-156).

[4]
The ALJ erred in dating the opinions: Baltz offered two opinions, on January 5, 2021, and on April 13, 2021.  (Tr. 678-679 and 733-734).  Michel also submitted two opinions, on December 7, 2020, and on April 13, 2021.  (Tr. 691-692 and 737-738).

memory, in social interaction, and in adaptation, and in sustained concentration and persistence. The undersigned finds that these opinions are not persuasive, as they are not consistent with the remainder of the objective medical evidence. These limitations are in check box form and are not supported by explanation from examinations or evaluations on the forms. However, the record supports a lesser degree of restriction with mild and moderate limitations in the 'B' Criteria of the listings. For example, test results at the consultative exam showed the claimant to be functioning within the range of intellectual disability; however, he did not make good effort on testing. Dr. Spellman suspected that the claimant's abilities lied in the borderline range. Most of his effort was suspect and sometimes he clearly got things wrong on purpose. Furthermore, at the consultative exam, the claimant's mood was normal and appropriate affect. Speech was understandable. Thought processes were logical, relevant, and goal directed. These opinions are not consistent with examination by his psychotherapist, which showed that the claimant had euthymic mood with congruent affect. Accordingly, the undersigned finds that these opinions are not persuasive.

(Tr. 28).

*Analysis*

The regulations governing the consideration of the medical opinions were revised for claims filed on or after March 27, 2017. Martin filed his claim in February 2020. The new regulations eliminated the "long-standing 'treating physician' rule." *See Fatuma A. v. Saul*, 2021 WL 616522, 5 (D. Minn. 2021), report and recommendation adopted, 2021 WL 615414 (D. Minn. 2021). The regulations now provide the following:

> ... Under the new regulatory scheme, the Commissioner "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R.

404.1520c(a). Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. 20 C.F.R. 404.1520c(a), ©. ALJs are required to "explain" their decisions as to the two most important factors—supportability and consistency. 20 C.F.R. 404.1520c(b)(2). The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. 404.1520c(c)(1)-(2).

The new articulation requirements are meant to "provide individuals with a better understanding of [the Commissioner's] determinations and decisions" and "provide sufficient rationale for a reviewing adjudicator or court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854, 5858 (January 18, 2017). ...

*See Phillips v. Saul*, 2020 WL 3451519, 2 (E.D. Ark. 2020) (Deere, MJ).

The new regulations require the ALJ to discuss, at a minimum, the supportability and consistency of a medical opinion. Martin claims the ALJ failed to properly evaluate the opinions offered by Baltz and Michel. Specifically, Martin finds the ALJ discounted the opinions too heavily because of the check-box format used by Baltz and Michel, and that the ALJ's supportability analysis was flawed because he cherry-picked from the medical records to bolster his conclusion.

Regarding the check-box format, Martin concedes that such opinions "alone may constitute weak evidence" but that these opinions should not be so easily dismissed when accompanied by treatment notes. Doc. No. 13, page 2. The four opinions uniformly use the check-box format without any accompanying notes,

explanations, or citations to treatment records.  The form provides twenty categories, giving the physician four rating options in each category: (1) not significantly limited; (2) moderately limited; (3) markedly limited; and (4) extremely limited.

Michel executed the form in December 2020 and again about five months later. The utility of the two medical source statements is in question when the two forms are compared.  Of the twenty categories only nine received the same rating in April 2021 as in December.  In six of the categories, Michel actually rated Martin as having improved in the five month span, while in five he had worsened.  This information is not beneficial.  Martin contends the Court should comb through the treatment notes to add meaning to the check-box form.  The record shows Martin was seen by Michel in December 2020 and again in April 2021, when he was seen for mid back pain.  The basis for the change in the ratings is not apparent; the shortcoming of the check-box format is apparent.  The Court is left to ponder why so many ratings changed in a short period of time, during which Martin was not examined by Michel.

The two opinions of Baltz were given in January and April of 2021.  The form was the same as used by Michel, with twenty categories and four rating options.  In April, four months after the first opinion, Baltz rated Martin the same level in only six categories, rated him worse in one category, and found improvement in thirteen categories, including in the ability to complete a normal workday.  It is difficult to rely

heavily on these forms, as they raise questions rather than answer them.  As with Michel, the treatment record during the four month stint between the disparate opinions does not indicate the reason for the change.  There is no error in the ALJ's reliance, or lack thereof, on the check-box forms submitted by Baltz and Michel.

Martin also argues ALJ error in cherry-picking treatment notes when considering if these opinions were supportable.  In the portion of his opinion dealing directly with the opinions of Baltz and Michel, the ALJ cited the findings of Phillips (employed with Baltz at Mid-South) that he presented with euthymic mood and congruent affect.  The ALJ also throughly discussed the findings of Spellman, which were a stark  contrast from the medical source statements of Baltz and Martin.  While the ALJ could have cited more examples in this portion of the decision, there were numerous other examples cited by the ALJ elsewhere.  For example, Martin  had normal mood and affect, was pleasant and alert and oriented when seen by Michel in June 2020, and Baltz noted in October 2020 that Martin was cooperative, with average eye contact, clear speech, no delusions/psychotic thoughts, auditory hallucinations, intact associations, logical thought process, angry mood, incongruent affect, poor judgment and insight, normal language, borderline intelligence, selective attentive, and oriented to person, place, time, and circumstance.   Thus, the notes of Baltz and Michel do not mirror their opinions.  This is an acceptable reason for discounting their

opinions. *See Adair v. Saul*, 816 Fed.Appx. 26 (8th Cir. 2020) (opinion may be discounted if inconsistent with physician's notes).   The references in the treatment notes to non-compliance, as well as the frequency of treatment, also weigh in favor of the ALJ's supportability conclusion.[5]

The ALJ's analysis of the opinions of Baltz and Michel was adequately supported.  As a result, the RFC determination was not erroneous.

In summary, substantial evidence supports the determinations reached by the ALJ.  The Court is mindful that its task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion.  The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012).  This test is amply satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of O'Malley is affirmed and Martin's complaint is dismissed with prejudice.

IT IS SO ORDERED this 2nd day of April, 2024.

_____

UNITED STATES MAGISTRATE JUDGE

---

[5]

Although Martin does not explicitly challenge the consistency of the ALJ's treatment of the opinions the Court finds the ALJ adequately addressed this issue, noting Spellman's findings and the findings of the state agency consultants.